Filed 11/23/22  In re J.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | B318498<br>(Los Angeles County<br>Super. Ct. No. 19LJJP00385A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.Y.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Susan Ser, Judge.  Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant M.Y. (mother) appeals from the order terminating parental rights over her daughter, J.S., who was nine years old when this case commenced in 2019. Mother contends the order must be reversed because of insufficient inquiry, investigation, and notice under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code § 224.2, subd. (b))[1] regarding J.S.'s Indian ancestry. Mother further contends the beneficial parent-child relationship exception to terminating her parental rights applied. We affirm the juvenile court's order.

## BACKGROUND

### Referral, investigation, and detention

On June 5, 2019, the Los Angeles County Department of Children and Family Services (the Department) received a referral that mother and her male companion, Casey P., had been arrested for vandalism and resisting arrest while J.S. was present. J.S. was taken into protective custody.

Mother told the responding social worker that she belonged to the Seminole Tribe of the Cherokee Indians. When asked about her current status with the tribe, mother said she had

---

[1] All further statutory references are to the Welfare and Institutions Code unless stated otherwise.

2

traveled to Palmdale in order to speak with the Tribal TANF.[2] Mother identified J.S.'s father as Justin S. but said she had not been in contact with him for several years and did not know how to reach him.

Mother told the social worker she removed J.S. from school at age seven and teaches the child at home. J.S. had been diagnosed with ADHD and dyslexia but was not currently taking any medication or receiving any services for those conditions.

J.S. told the social worker she is Cherokee. The child said she was homeschooled by mother but was unable to spell her own name or tell the social worker her year of birth. J.S. reported that she is "whooped" by mother and Casey P. with a hanger, belts, and device chargers.

Mother provided contact information for the maternal grandfather, who lived in San Francisco. The maternal grandfather's history with San Francisco Child Protective Services precluded him from being a placement option for J.S.

When the social worker contacted the maternal grandfather, he was aware of mother's incarceration. In response to questions about the family's Indian ancestry, the maternal grandfather stated he has Seminole ancestry but does not have a tribal membership number. He did not know whether mother had a tribal membership number but said she and her current husband were "deeply involved" and had traveled to Los Angeles to obtain membership.

---

[2] The California Tribal Temporary Assistance for Needy Families (TANF) Program assists Indian Tribes of California by providing funding, tools, and resources. (<https://www.cdss.ca.gov/tribal-tanf> [as of Nov. 16, 2022], archived at <https://perma.cc/W92X-75T3>.)

On June 5, 2019, the social worker contacted the Eastern Band of Cherokee Indians and left a message requesting information about the family's status with the tribe. The social worker also telephoned the Seminole Tribe of Florida but was unable to speak to anyone or leave a message because the office was closed.

**Section 300 petition**

On June 7, 2019, the Department filed a section 300 petition alleging J.S. was at risk of harm because of mother's physical abuse and failure to make an appropriate plan for the child's care and supervision during mother's incarceration. The petition included an Indian child inquiry attachment on which the social worker indicated J.S. may have Indian ancestry and may be a member or eligible for membership in a tribe. The social worker identified the name of the tribe as "S[e]minole" and the name of the band as "Cherokee." The social worker checked a box on the form that stated: "The child's parents, grandparents, or great-grandparents are or were members of a tribe."

On July 18, 2019, the Department filed a first amended petition adding allegations regarding Justin S., J.S.'s presumed father.

**Detention hearing and ICWA-020 forms**

Mother was present at the June 10, 2019 detention hearing. She filed an ICWA-020 form on which she checked a box stating, "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe." Mother wrote "Seminole/Cherokee" as the names of the tribe and band. Mother also provided the names and telephone numbers of the maternal grandfather and maternal grandmother.

4

The juvenile court found Justin S. (father)[3] was J.S.'s presumed father and ordered the Department to attempt to locate him. The court deferred a determination of ICWA status until father appeared and ordered the Department to investigate mother's Seminole and Cherokee heritage. The juvenile court ordered J.S. detained from both parents and accorded mother monitored visits three times a week for three hours.

**ICWA investigation and notice**

In its July 19, 2019 jurisdiction/disposition report, the Department reported ICWA may apply based on mother's claimed Seminole and Cherokee ancestry. When the social worker asked mother about her Indian ancestry on June 10, 2019, however, mother stated, "They won't let us in, that's what we're doing down here. We're here to talk to the Martinez TANF."

On June 17, 2019, mother told the social worker she was not enrolled in the Seminole or Cherokee tribes. When asked about extended family members, mother said J.S.'s maternal grandmother had Cherokee heritage and the maternal grandfather had Seminole heritage, but neither was registered with a tribe. The maternal grandmother lived in San Francisco and was approximately 48 years old. Mother provided a telephone number for the maternal grandmother, but she did not know the maternal grandmother's address. Mother further reported the maternal great-grandmother, Linda Doogle Mack, had Cherokee heritage but mother did not know if she was registered with any tribe. Mother was unsure of the spelling of the maternal great-grandmother's birth name, Doogle. Mother

---

[3]     Father is not a party to this appeal.

5

did not have contact information for the maternal great-grandmother but said that she also lived in San Francisco and was approximately 60 years old.  The maternal great-grandfather, Melvin Y., was deceased, and mother was unsure whether he had Indian ancestry or had been enrolled in any tribe.  Mother further stated that J.S.'s great-grandparents on mother's paternal side of the family, Alice D. Davis and Myles A. Williams, were both deceased and had Seminole heritage, but mother did not know whether either was enrolled or registered with a tribe.

The Department located father in San Francisco and notified him of the proceedings.  After father denied having any Indian ancestry, the Department mailed him ICWA forms.

On July 19, 2019, the Department sent an ICWA notice and an ICWA ancestry addendum by certified mail to the Bureau of Indian Affairs (BIA), Secretary of the Interior, Seminole Nation of Oklahoma, Seminole Tribe of Florida, Cherokee Nation, United Keetoowah Band of Cherokee Indians in Oklahoma, and the Eastern Band of Cherokee Indians and was awaiting responses.  The ICWA notice and ICWA ancestry addendum identified the maternal grandfather as Myles Lee (Williams); indicated that he was born on September 28, 1955, in South Carolina; and stated that he had Seminole heritage.  The IWCA notice and addendum identified the maternal grandmother as Melvina Y., stated she had Cherokee ancestry, gave her birth date and approximate age as 48 (but indicated that her birth year was not known), and listed San Francisco as her place of residence.  The addendum identified the maternal great-grandmother as Linda Doogle Mack as having Cherokee ancestry.  The addendum indicated that the spelling of the maternal great-grandmother's birth name, Doogle,

6

was uncertain. The addendum stated that the maternal great-grandmother was born in Louisiana on June 24, indicated that her year of birth was not known, and listed her approximate age as 60. The addendum stated that the maternal great-grandmother currently lived in San Francisco. The addendum also identified and provided information concerning great-grandparents Alice D. Davis and Myles A. Williams and stated that they both had Seminole ancestry.

On August 6, 2019, the Department reported it had received responses from the Eastern Band of Cherokee Indians and the Seminole Tribe of Florida. Both tribes stated that J.S. was not registered or eligible to register for membership.

On August 30, 2019, the United Keetowah Band of Cherokee Indians informed the Department that J.S. "does not meet the . . . definition of 'Indian Child' in relation to the United Keetowah Band of Cherokee Indians." The Cherokee Nation informed the Department on October 10, 2019, that J.S. was not an Indian child in relation to the Cherokee Nation as defined under ICWA. On January 20, 2020, the Seminole Tribe of Oklahoma notified the Department that J.S. not a member or eligible for membership in its tribe.

**Jurisdiction/disposition hearing**

Mother was not present at the July 20, 2020 jurisdiction and disposition hearing. Her attorney requested a continuance because she had been unable to reach mother. The juvenile court found notice was proper and proceeded with the hearing.

The juvenile court found, without objection from any of the parties, that ICWA did not apply. The court then sustained the amended section 300 petition and ordered J.S. removed from parental custody. Mother was accorded family reunification

7

services and monitored visits for a minimum of two hours per visit, two times a week.

**Review proceedings and termination of reunification services**

In January 2021, the Department reported that mother's visits and telephone calls with J.S. had been inconsistent. Mother did not telephone J.S. at all in September or October 2020. She called once in November 2020 and twice in December 2020. Mother's sporadic telephone calls appeared to trigger mental health problems for J.S. The child seemed depressed, had difficulty sleeping, and exhibited behavioral problems such as impulse control and hyperactivity. J.S. was receiving therapy to address these problems.

Mother gave birth to a baby girl in September 2020. Mother had not provided the Department with proof of participation in any court ordered programs.

Although the juvenile court had found in July 2020 that ICWA did not apply, mother sent the social worker two e-mails in December 2020 regarding her Indian ancestry. A December 9, 2020 e-mail stated, "my great great great grandmother on my father side from the East coast Lillie G. Davis [C]hoctaw roll #12589 Oklahoma Indian child welfare act [¶] P.s.UCC-1-308 [¶] All Rights Reserved Under United Nations Declaration Rights of Indigenous People 2010 (Articles 45). American Indian Choctaw Roll#12589, [¶] All Rights Non Waived 2020."

A December 10, 2020 e-mail stated in relevant part:

"The Binay Yeha Noha Nation

"Contact: Chief Peace Eaglefeather

"Office address: 1530 N Harrison St. #1012 Shawnee OK. 74804

"Office hours: T-F from 10am-4pm, Sat. from 10am-3pm

"Phone number: 217-364-2045

"Website: info@thebinaytribe.com


"Turtle Island North American

"Contact: Chief Spirit Falcon

"Office email: myobgov@gmail.com

"Website: MY-OB.com

"Phone number: 916-750-4192"

J.S. was present by Webinex at the February 5, 2021 six-month review hearing, but neither parent was present. The juvenile court found the parents had not substantially complied with their respective case plans and terminated reunification services. The court noted that mother was "rarely visiting" and that her visits had "not been consistent even to say once a month." J.S.'s counsel reported that mother's sporadic contact with J.S. was impeding the child's progress. Counsel further stated that J.S. was requesting suspension of mother's visits for a time, because the child had said she "needs a break from mom." Over the objection of mother's attorney, the juvenile court suspended both parents' visits until "they make themselves more available [t]o the Department in regards to their abilities to maintain their composure during the telephone calls." The court gave the Department discretion to resume the visits.

As to ICWA, the juvenile court noted that mother had frequently provided information regarding her possible Indian ancestry and that her most recent submission included tribal enrollment numbers. The Department's counsel stated that the

Department did not believe mother's e-mail submissions referred to any federally recognized tribes. The juvenile court pointed out that Choctaw was a federally recognized tribe and ordered the Department to send notice, including the enrollment number mother had provided, to the Choctaw tribes.

**Section 366.26 proceedings**

The Department reported in June 2021 that it had mailed ICWA notices to the Choctaw Nation of Oklahoma, the Mississippi Band of Choctaw Indians, and the Jena Band of Choctaw Indians but had not yet received responses.

Mother had not visited J.S. since 2019, and her telephone calls with the child remained inconsistent. During the calls mother often spoke about her new baby rather than asking about J.S. Telephone calls with mother continued to trigger mental health problems for J.S.

J.S. appeared to be struggling with rejection by her parents. When asked about adoption, J.S. said she did not want to be adopted but preferred to stay with "Aunt Wendy," the sister of the current caregiver. That caregiver subsequently asked J.S. to be replaced because of behavioral issues. J.S. was placed with a new caregiver on May 7, 2021.

In a last minute information for the court dated July 16, 2021, the Department reported that it had received a document from the Chata/Choctaw Muskogee Yamassee Nation, The Return of The Mound Builders indicating that mother and J.S. were enrolled members of the tribe, and that the tribal court had accepted jurisdiction and ordered J.S. returned to mother's care. After obtaining contact information for the tribe from mother, the social worker spoke by telephone with Chief Rawsheed Stone Coyote Patton, who confirmed mother's enrollment in the tribe.

Chief Patton stated that the tribe "is related to the mother Tribe of Yamassee Nation . . . under a Tribal Community called Undrip International Law . . . registered as Allodial Title, which is honored by the Law of Republic." Chief Patton gave the social worker an address for the tribe in Lancaster, which the Department later determined to be a 1,697-square-foot single family home. After additional investigation and research, the Department determined that the Chief Patton's tribe was not federally recognized, nor was it recognized in the State of California or the County of Los Angeles.

Mother was present at the July 19, 2021 hearing at which the juvenile court stated that based on mother's claims that she may have Cherokee, Seminole, or Choctaw ancestry, the Department had sent ICWA notices to those tribes. Responses from the Choctaw tribes were still pending, but the court had received notice that J.S. was not a member of or eligible for membership in the Cherokee or Seminole tribes. The court nevertheless ordered the Department to send notice of the section 366.26 hearing to all previously noticed tribes.

The juvenile court then addressed the document received from the Chata/Choctaw Muskogee Yamassee Nation, The Return of The Mound Builders and asked whether counsel for any of the parties wished to be heard. Counsel for the Department and for J.S. both reported that they had separately investigated the matter and determined that the tribe was not federally recognized. Counsel for mother submitted the matter to the court. The juvenile court stated that there was no tribal court in Los Angeles County for any federal or state recognized Indian tribe. The court accordingly stated it would not enforce the purported tribal court order to release J.S. to mother. The

11

juvenile court found that J.S. was not an Indian child under ICWA or applicable California law and set a section 366.26 hearing for October 5, 2021.

Members of the Chata/Choctaw Muskogee Yamassee Nation were present at the August 5, 2021 hearing to review the permanent plan. Mother's counsel asked that J.S. be returned to mother's custody. Mother's counsel also requested a written visitation order and a random drug testing order. Counsel for J.S. and the Department opposed further reunification services and asked that mother's visits be reduced to once a month. Counsel for the Department also asked the juvenile court to make a finding that ICWA did not apply. Mother's counsel objected to the reduced visitation request and noted that mother and the Chata/Choctaw Muskogee Yamassee Nation disagreed with the juvenile court's previous finding that ICWA did not apply.

The juvenile court denied the request for random drug testing and ordered adoption as the permanent plan. The court accorded mother one monitored visit a month and ordered the Department to provide mother with a written visitation schedule. The juvenile court noted it had previously found, in a July 19, 2021 minute order, that J.S. was not an Indian child under ICWA.

In September 2021, the Department reported that it had sent notice of the section 366.26 hearing to the BIA, the Secretary of the Interior, and the Cherokee, Seminole, and Choctaw tribes.

The Department further reported that mother had a telephonic visit with J.S. on August 27, 2021, and an in person visit on August 31, 2021. During the in person visit, mother and J.S. had lunch together and discussed many subjects including

school and video games. J.S. appeared sad at the end of the visit and said she wanted the visit to last longer.

J.S.'s current caregiver, Ms. B., said she was looking forward to adopting J.S. and noted that the child had made positive changes. J.S. told the social worker that she enjoyed living with Ms. B., whom she called "mom."

On October 5, 2021, mother's counsel requested increased visitation. The juvenile court ordered the Department to assess providing mother more visitation and to interview J.S. regarding her wishes for permanency.

In January 2022, the Department reported that J.S. was doing well with Ms. B. but continued to struggle with rejection by her parents. Mother appeared to be making minimal efforts to attend in person visits. Mother had an in person visit with J.S. on September 21, 2021. Mother brought food and made a shell and bead necklace for J.S. Mother attempted to coach J.S. to say she wanted to "come home" and criticized the child for being unable to read a letter mother had written for her. When the social worker redirected mother, mother became angry and confrontational, and J.S. became upset. When the social worker had to terminate the visit 30 minutes early, mother became abusive and yelled profanities at the social worker.

Mother had in person visits on October 8, 2021, and October 15, 2021. The October 15, 2021 visit was appropriate, although mother arrived 45 minutes late. She brought food, a birthday balloon, and a cake for J.S. Mother had a telephonic visit with J.S. on November 17, 2021, but was upset that Ms. B. monitored the visit. During the visit, J.S. repeatedly told mother she was ready to end the call and get ready for dinner. An

attempted telephonic visit on December 9, 2021, was unsuccessful, as mother's phone repeatedly disconnected.

J.S. continued to struggle with emotional problems triggered by in person visits with mother. Ms. B. noted that J.S. was generally unhappy after the in person visits and would take about an hour to return to normal. J.S. was in counseling to address her behavioral and emotional issues. The child expressed conflicting feelings about mother. She said she loved living with Ms. B., but also wanted to live with mother.

**Section 366.26 hearing**

At the February 7, 2022 section 366.26 hearing, the juvenile court admitted into evidence the Department's reports. The court also admitted a September 19, 2021 letter from New Directions Alcohol and Drug Services stating that mother had enrolled on August 2, 2021, and was receiving individual counseling, parenting, and substance abuse education.

J.S. testified in chambers. She said she did not talk with mother very often. When prompted by mother's counsel, J.S. said she spoke with mother once a week. J.S. could not articulate what adoption meant to her. When mother's counsel asked whether J.S. knew that once she was adopted, she would be unable to speak to mother again, J.S. responded, "Will I be able to see aunt Wendy?" After a discussion about aunt Wendy and J.S.'s history of foster placements, mother's counsel again asked how J.S. would feel about not being able to speak with mother. J.S. responded, "A little—I would have a little bit of second thoughts about that there. But maybe I'll have,—maybe I'll change my mind. I don't know. I don't know." When asked how she would feel if she could not have any more visits with mother, J.S. replied, "A little sad." J.S. said she called both mother and

14

Ms. B. "mom." J.S. further stated that she "wanted to stay with [Ms. B.] because she was the nicest person that was going to take care of me. So I'm—I'm going to stay with her. And I might want to be adopted by her." When mother's counsel asked, "Right now would you like to be adopted by her?" J.S. replied, "As long as as—as long as I don't have [to] have any more therapy sessions."

Mother's counsel then asked J.S. whether she participated in any traditions with mother and her tribe. J.S.'s counsel objected on relevance grounds, and the juvenile court asked mother's counsel to explain the relevance of that question. Mother's counsel responded, "because these are traditions that she won't be able to participate in, when adopted." The juvenile court sustained the relevance objection.

J.S.'s counsel asked the child, "When was the last time you had your visit with your mom?" J.S. stated, "Like, I don't know; a long time ago."

Mother testified that her last visit with J.S. was on October 15, 2021. She had a Zoom call with J.S. on January 28, 2002. Mother explained that she learned in November that the maternal grandfather had been hospitalized, and she returned to San Francisco to care for him. Mother lived in San Francisco at the time of the section 366.26 hearing. When asked how often she spoke with J.S., mother said "maybe once a month."

The Department's counsel asked mother how often she had visited with J.S. in 2020. Mother replied, "I believe it's—I was there four times." Mother said she visited the child "about five times" in 2021. When asked if she was having weekly calls with J.S., mother said, "No. I just had one Zoom meeting with her." Counsel for the Department then asked mother whether she

15

participated in any of J.S.'s education activities. Mother responded, "No. Everything's classified."

After hearing argument from counsel, the juvenile court found there was no reason to know J.S. was an Indian child. The court further found mother had not maintained regular visitation or contact with J.S. and had not maintained a bond with the child. The juvenile court terminated parental rights, ordered adoption as the permanent plan, and designated Ms. B. as the prospective adoptive parent.

This appeal followed.

**Mother's additional evidence on appeal**

While this appeal was pending, we granted mother's request that we consider additional evidence she presented pursuant to Code of Civil Procedure section 909 (see *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, fn. 4 (*Dezi C.*), review granted Sept. 8, 2022, S275578) and took judicial notice of mother's declaration and the following documents attached as exhibits to her declaration:

Exhibit A: Department of the Interior, Commission to the Five Civilized Tribes, In the Matter of the Allotment of the Lands of the Choctaws and Chickasaws, General Office, Allotment to Lillie G. Davis, Choctaw Roll by Blood No. 12589, Ledger No. 18, Page 191.

Exhibit B: Department of the Interior, Commission to the Five Civilized Tribes, In the Matter of the Allotment of the Lands of the Choctaws and Chickasaws, General Office, Allotment to Lillie M. Davis, Choctaw Roll by Blood No. 15615, Ledger No. 20, Page 226.

Exhibit C: Department of the Interior, Commissioner to the Five Civilized Tribes, Creek Land Office. Allotment to Celia

16

Cole, Minor Creek Freedman enrolled under Act of Congress approved April 26, 1906, (Public No. 129.), No. 256.

Exhibit D: Department of the Interior, Commission to the Five Civilized Tribes, In the Matter of the Allotment of the Lands of the Choctaws and Chickasaws, General Office, Allotment to Celia Cole, Choctaw Freedmen Roll No. 2795, Ledger No. 9, Page 337.

Exhibit E: a document from the National Archives and Record Administration, page 16 of 114, regarding mother's great-, great-grandmother Mary Miller's enrollment in the Cherokee Tribe.

## DISCUSSION

### I. ICWA

#### A. *Applicable law and standard of review*

ICWA reflects the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741.) "The duty to

inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child. (§ 224.2, subd. (a).)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child. (§ 224.2, subd. (c).) In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (*Ibid*.)

If the initial inquiry creates a "reason to believe" the child is an Indian child, then the Department "shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd.

18

(e).)  The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the BIA and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.  Contact with a tribe must include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under ICWA. (§ 224.2, subd. (e).)

The sharing of information with tribes at the ICWA inquiry stage is distinct from formal ICWA notice, which requires a "reason to know"—rather than a "reason to believe"—that the child is an Indian child.  (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048-1049 (*D.S.*).)  A "reason to know" that a dependent child is an Indian child exists under any of six enumerated circumstances:  "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child.  [¶]  (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village.  [¶]  (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child.  [¶]  (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child.  [¶]  (5) The court is informed that the child is or has been a ward of a tribal court.  [¶]  (6) The court is informed that either parent or the child possess[es]  an identification card indicating membership or citizenship in an Indian tribe."  (§ 224.2, subd. (d).)  The less stringent "reason to

19

believe" standard requiring further inquiry is based upon the six "reason to know" statutory circumstances: "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd. (e).)

We review the juvenile court's ICWA findings for substantial evidence. But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*D.S., supra*, 46 Cal.App.5th at p. 1051.)

**B.** **_Initial and further inquiry_**

Mother contends the Department and the juvenile court failed to fulfill their duties of initial and further inquiry under ICWA because the juvenile court failed to instruct mother at the detention hearing that she should inform the court of any subsequently obtained information regarding J.S.'s possible Indian ancestry and because the social worker refused to accept mother's information regarding Indian ancestry and failed to provide relevant information to the juvenile court.

The juvenile court's failure to instruct mother to provide further ICWA-related information was harmless. The record shows that throughout the case mother, on her own initiative, regularly provided the Department and the juvenile court with information she believed relevant to an ICWA determination. There is no reason to believe that a different result would have

20

occurred if the juvenile court had instructed mother to do so. (*Dezi C., supra*, 79 Cal.App.5th at p. 779, review granted.)

The record shows that any deficiency in the Department's initial ICWA inquiry was also harmless. Although the record does not indicate that the Department attempted to locate and interview the maternal grandmother or the maternal great-grandmother, whose names, approximate ages, and city of residence mother provided (mother also provided a telephone number for the maternal grandmother), mother told the social worker that the maternal grandmother was not enrolled or registered in any tribe. Mother, father, and the maternal grandfather all denied being enrolled or registered in any federally recognized Indian tribe. Mother told the social worker in June 2019 that the tribes she had identified "won't let us in." Further inquiry accordingly would not have resulted in a reason to know that J.S. is an Indian child, defined under ICWA as a child who is either a member of an Indian tribe or is or eligible for membership in an Indian tribe *and is the biological child of a member of an Indian tribe.* (25 U.S.C. § 1903(4); see § 224.1, subds. (a), (b).)

The additional evidence proffered by mother on appeal does not alter this result. In the declaration mother submitted in support of her request to present additional evidence, mother states that sometime between April 20, 2021, and February 7, 2022, she obtained additional information concerning J.S.'s Indian ancestry (exhibits A-E attached to mother's declaration). Exhibits A and B to mother's declaration are documents that concern maternal great-, great-, great-grandmother, Lillie G. Davis, and maternal great-, great-grandmother, Lillie M. Davis, and appear to provide enrollment numbers for both women in the

21

Choctaw Tribe. Exhibits C and D concern Celia Cole, a maternal great-, great-, great-grandmother, and appears to provide an enrollment number for her on the "Choctaw Freedmen Roll." Exhibit E concerns Mary Miller, a maternal great-, great-grandmother purportedly showing her enrollment in the Cherokee tribe. Mother states in her declaration that she sent exhibits A, C, and D to the social worker sometime before mother's parental rights were terminated on February 7, 2022, but she did not send exhibit B because the social worker told her the Department did not want additional information as mother was not an enrolled member of the tribe.

Although the record does not show that the Department provided the juvenile court with any of the exhibits attached to mother's declaration or shared those documents with the contacted tribes, the failure to do so was harmless. The Department did send notice to the Choctaw Tribes that included Lillie G. Davis's enrollment number, but those tribes did not respond. The record shows that J.S. is not an Indian child as defined in ICWA, because she is not the biological child of a member of any of the Indian tribes identified by mother. Nothing in the record as augmented on appeal changes this result. There is accordingly no reason to believe that further inquiry concerning J.S.'s more distant and long-deceased relatives would lead to a different result.

C. *Notice*

Here, there was reason to believe J.S. may be an Indian child, but not reason to know she is an Indian child. Mother does not contend otherwise but argues nevertheless that ICWA notice was deficient. Because there was no "reason to know" J.S. is an Indian child, the Department was not required to notice any

22

tribes in conformance with section 224.3. Although section 224.3, subdivision (c) requires a child welfare agency to file copies of ICWA notices sent and return receipts and responses received when there is a reason to know a child is an Indian child, there is no similar provision when there is a reason to believe a child is an Indian child. (*D.S., supra*, 46 Cal.App.5th at p. 1049 ["The sharing of information with tribes at [the further] inquiry stage is distinct from formal ICWA notice, which requires a 'reason to know'—rather than a 'reason to believe'—that the child is an Indian child."].) We therefore reject mother's contention that the Department's notice to the tribes did not conform with the statutory requirements for formal notice.

The record, moreover, shows that the Department did send multiple ICWA notices to the Seminole, Cherokee, Choctaw, and Chata/Choctaw Muskogee Yamassee Tribes, and to the BIA and the Secretary of the Interior.

### D. *No prejudicial cumulative error*

We reject mother's argument that the record as augmented by mother's submissions on appeal demonstrate cumulative prejudicial error requiring reversal of the juvenile court's findings and order. For reasons discussed previously, nothing in the augmented record gives rise to a reason to know J.S. may be an Indian child under ICWA.

### E. *Substantial evidence supports the ICWA finding*

The juvenile court found that it had no reason to know J.S. is an Indian child. Substantial evidence supports that finding. As discussed, mother and father both stated they were not members of any Indian tribe recognized under ICWA or California law. The maternal grandfather also denied being a member of an Indian tribe, and mother stated that the maternal

23

grandmother was not a member of a tribe. The evidence accordingly shows that J.S. is not an Indian child as defined in ICWA and applicable California law. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

Moreover, the Department sent ICWA notices to all of the federally recognized tribes mother identified. The Seminole and Cherokee Tribes responded by stating that J.S. was not a member or eligible for membership. The Choctaw Tribes did not respond. Substantial evidence supports the juvenile court's finding that ICWA did not apply.

That the juvenile court precluded mother's counsel from asking J.S. at the section 366.26 hearing whether the child participated in Native-American traditions with mother has no bearing on whether J.S. is an Indian child. A child's participation in Native-American traditions is not one of the enumerated statutory circumstances for determining whether there is a reason to believe or a reason to know the child is an Indian child under ICWA. (See § 224.2, subds. (d), (e).)

## II. Beneficial parent-child exception

### A. *Applicable law and standard of review*

Once a juvenile court has terminated reunification services and determined that a child is adoptable, the court is required to terminate parental rights unless it finds an applicable exception. (§ 366.26, subd. (c)(1).) The exception at issue here, sometimes referred to as the beneficial parent-child exception, applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

24

The parent bears the burden of proving that the exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) To do so, the parent must prove three statutory elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

For the first element, visitation, the question is simply whether the parent visited consistently, as permitted by court orders. The focus is not on punishing or rewarding parents for their behavior in visiting or maintaining contact, but on the best interests of the child. (*Caden C., supra*, 11 Cal.5th at p. 632.)

As to the second element, whether the child would benefit from continuing the relationship, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) The parent must also show that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) Relevant factors in assessing the parent-child relationship include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.) For the third element, whether termination would be detrimental to the child, the court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be

25

like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, at p. 633.)

We review the juvenile court's findings concerning visitation and whether the child would benefit from continuing the relationship with the parent for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to a child because of the child's relationship with the parent is a question we review for abuse of discretion. (*Ibid.*)

**B.    *Substantial evidence supports the juvenile court's findings***

Substantial evidence supports the juvenile court's finding that the beneficial parent-child exception did not apply.

The record shows that mother did not maintain regular visitation with J.S. The Department reported in January 2021 that mother had not been consistently visiting or calling J.S. Mother did not call J.S. at all in September and October 2020, called once in November 2020, and twice in December 2020. In February 2021, the juvenile court found mother was "only rarely visiting" and had "not been consistent to even say once a month." In June 2021, the Department reported mother's telephonic contact with J.S. remained inconsistent, and she had not visited the child since 2019. Mother had a telephonic visit with J.S. on August 27, 2021, and her first in person visit with the child since 2019 on August 31, 2021. Mother had three in person visits with J.S. in September and October 2021 and one telephonic visit in November 2021.

Mother testified at the section 366.26 hearing that she spoke with J.S. "maybe once a month" and had visited with the child nine times throughout 2020 and 2021. When J.S. was

26

asked at the hearing when she had last visited with mother, the child replied, "Like, I don't know; a long time ago." Substantial evidence supports the finding that mother did not maintain regular visitation with J.S.—a necessary element of the beneficial parent-child exception.

We reject mother's argument that the COVID-19 pandemic and other events precluded her from maintaining visitation with J.S. Pandemic restrictions did not prevent mother from maintaining telephonic contact with J.S. The record does not support mother's assertion that she visited regularly with J.S. before the pandemic. Mother chose to relocate to San Francisco to care for the paternal grandfather rather than remaining in Los Angeles where she could have in person visits. While in San Francisco, mother had minimal telephonic contact with J.S. Mother could not explain why she did not visit more frequently with J.S. before moving to San Francisco.

Mother's failure to maintain regular visitation and contact with J.S. precludes application of the beneficial parent-child exception to termination of her parental rights. (*Caden C., supra*, 11 Cal.5th at p. 631.)

Substantial evidence also supports the finding that J.S. did not share a substantial, positive emotional attachment with mother that would not be outweighed by the permanency of an adoptive home. Rather, the record shows that mother's sporadic contact with J.S. triggered mental health issues for the child, who struggled with depression and feelings of rejection throughout the case. In February 2021, J.S., through her counsel, asked the juvenile court to suspend mother's visits because J.S. "need[ed] a break from mom." In January 2022, J.S.'s caregiver observed that the child was unhappy after visits with mother and would

take about an hour to return to normal. At the February 2022 section 366.26 hearing, when J.S. was asked whether she knew she would not be able to speak with mother after being adopted, J.S. responded, "Will I be able to see aunt Wendy?" When asked how she would feel if she could no longer visit with mother, J.S. said she would feel "[a] little sad." The child also stated that she wanted to remain with Ms. B., her prospective adoptive parent, "because she was the nicest person that was going to take care of me."

Mother argues that she had a relationship with J.S., the continuation of which could benefit the child. The mere existence of a parental relationship, however, is insufficient. "Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) The record does not support mother's assertion that such an attachment existed between her and J.S.

That the juvenile court precluded mother's counsel from asking J.S. at the section 366.26 hearing whether the child participated in Native-American traditions with mother did not, as mother claims, impair her ability to demonstrate that she and J.S. shared a significant bond or attachment. When the juvenile court asked counsel to explain the relevance of that question, counsel responded, "these are traditions that she won't be able to participate in, when adopted." Counsel's inquiry was focused on the loss of customs or tradition, not on the severing of a parental bond.

28

The juvenile court did not abuse its discretion by concluding that terminating parental rights would not be detrimental to J.S. The relevant inquiry in this determination "is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)

J.S. testified that she would feel "[a] little sad" if she could not longer visit with mother. J.S. also testified that she wanted to stay with her prospective adoptive parent, whom she called "mom" "because she was the nicest person that was going to take care of me." J.S. then definitively stated, "I'm going to stay with her." There is substantial evidence in the record that J.S.'s interests would be best served by the stability of adoption with her prospective adoptive parent, who met the child's daily physical and emotional needs and offered her a permanent home.

## DISPOSITION

The order terminating parental rights is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.